In re RANCH HOUSE MOTOR INN INTERNATIONAL, INC., Pedro L. Rodriguez, Debtors.

FMS Management Systems, Inc., Plaintiff,

v.

Pedro L. Rodriguez and Ranch House Motor Inn International, Inc., Defendants.

Bankruptcy Nos. 8:03–BK–23940–MGW, 8:04–BK–05126–MGW. Adversary No. 8:04–AP–00067–M.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 17, 2006.

Amy L. Drushal, Esq. and Stanley H. Eleff, Esq., Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, for Plaintiff.

Malka Isaak, Esq., Feinberg, Isaak & Smith, P.A., Tampa, FL, Charles R. Mayer, Esq., Highland City, FL, for Defendants.

### Findings of Fact and Conclusions of Law

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

This adversary proceeding arises out of a dispute between a landlord and a tenant concerning the parking area that the tenant is entitled to use under a lease. The landlord owns a parcel of land upon which is located a motel, a restaurant, and a miniature golf course. The landlord entered into a lease of the restaurant to the tenant which describes the premises as: "Restaurant facility and parking located at 1915 Cypress Gardens Boulevard, Winter Haven, Florida, and as more particularly depicted on the attached sketch ..." ("Lease"). No sketch was ever prepared or attached by either party to the Lease.

The restaurant and motel are on the same parcel of land and both businesses require parking for their guests, vendors and employees. At issue in the proceeding is whether the Lease clearly identifies the parking area for the motel. If not, then the Court must determine the terms of the Lease with respect to parking.

Under Florida law, when a contract is ambiguous and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring a review of evidence extrinsic to the contract bearing upon the intent of the parties. *AT & T Wireless Services of Fla., Inc. v. WCI Communities, Inc.,* — So.2d ——, 2005 WL 2140234, at *2 (Fla. 4th DCA Sept.7, 2005). In this case, while the description of the physical building as 1915 is not ambiguous, the description of "parking" is ambiguous in that the restaurant and adjoining motel are located on the same parcel of land. Furthermore, the phrase "*and* as more particularly depicted on the attached sketch" is ambiguous because it does not identify the additional parking to which that phrase refers. Jt. Ex. 1 at ¶ 1 (emphasis added).

Moreover, the general rule is that a description of the leased premises by a street number includes as much of the lot upon which the building is situated as is necessary for the purpose for which it was let. *S.S. Jacobs Co. v. Weyrick,* 164 So.2d 246, 249 (Fla. 1st DCA 1964), *cert. denied,* 169 So.2d 388 (Fla.1964). While a lease of a particular part of a larger parcel "ordinarily gives the lessee no rights outside such part," it does give the lessee such rights "as were intended to be included as appurtenant to the beneficial enjoyment thereof ... and which is reasonably essential to the enjoyment of the leased premises...." *Id.*

In this case, based on the extrinsic evidence concerning the intent of the parties when the Lease was executed as well as the subsequent course of conduct, those rights include the right to the use of the contiguous parking spaces, to the extent not occupied by hotel guests, and the shared dumpster. Accordingly, judgment

will be entered declaring that the property rights under the Lease include shared use of the parking lot and dumpster area and adequate access to the leased premises by delivery trucks to the extent and as more particularly set forth below.

### Findings of Fact

The plaintiff in this action is the tenant, FMS Management Systems, Inc. ("FMS"). FMS operates a number of International House of Pancakes ("IHOP") restaurants throughout the state of Florida. The defendants in this action are the landlord, Pedro Rodriguez ("Rodriguez"), and his corporation, Ranch House Motor Inn International, Inc. ("Ranch House Int'l") (collectively, "Defendants"). Rodriguez is the successor by assignment of the Lease from the prior owner of the property, Ranch House Motor Inn, Inc. ("Ranch House").

The Lease was executed by FMS and Ranch House on August 1, 1995. The term of the Lease is five years, with options to extend the Lease for five additional five-year periods. The rent for the initial five-year period was $600 per month. The rent increases upon the exercise of each successive five-year option by $100 per month.

The terms of the Lease were negotiated by Bob Leonard ("Leonard"), FMS's president, and Sandra Klingman ("Klingman") on behalf of Ranch House, the owner of the property prior to its sale to Rodriguez. Klingman was one of several shareholders and an officer and director of Ranch House, as well as day-to-day manager of the motel. She managed the motel from the 1980s until 1997, over a year after the property was sold and the Lease assigned to Rodriguez in November of 1996.

The Court gives great weight to Klingman's testimony, which was in the form of a videotaped deposition played at trial, and the transcripts of two prior depositions, one on March 15, 2002, and another on March 12, 2003, both of which were admitted into evidence. Klingman exhibited no bias for or against either party. She had no financial interest in the outcome of the trial. She answered the questions fully and without any evasion. If there is any ambiguity in reconciling her statements at different times, these instances resulted from the way leading questions were used at times during cross examination of a friendly, helpful witness.

According to Klingman, the motel had "a horrible history of turnover of restaurant people" prior to the Lease with FMS. There had been a continuous stream of restaurant operators-in the range of "10 to 20 turnovers." The tenant that immediately preceded FMS "left the restaurant a horrible mess . . . left his employees without being paid. . . ."

Klingman was charged with the "responsibility to find a company that I could count on being there year round, seven days a week, three meals a day." Because the motel clientele were mostly long term or groups, it was particularly important that an operating restaurant be located on the property. "[I]t's a real asset to a hotel or motel to have a restaurant available for their clientele, that's the main reason most hotels and motels have them, to have the availability there for their customers and to be able to market it as so."

She was also of the view that it would be an advantage to find a tenant with a brand name rather than "a mom and pop" operator. "To me the key issue is to have somebody stable, have somebody you can count on." Apparently through happenstance, she was discussing the problem with a friend while they were having lunch at an IHOP restaurant in South Florida, and the discussion led to her speaking with the manager of that location who gave her

the contact information for the corporate headquarters of FMS. She then approached Leonard to inquire about opening an IHOP restaurant at the motel's vacant restaurant building.

Thereafter, FMS and Ranch House entered into discussions about the terms of a lease of the restaurant location on the premises. In determining the monthly rental amount, Ranch House's primary concern was receiving enough money to pay the property taxes. At the same time, it wanted to allow its new tenant to start its business with a low monthly rent, although the initial rent of $600 per month was still more than what the previous tenants had paid, if they paid at all.

The parties used a standard FMS form of lease. Other than the ambiguity created by the failure to attach the referenced sketch setting out a more particular depiction of the restaurant and associated parking, the form of lease used is straightforward and simple to understand. The parties to the lease were experienced businesspersons, each having been in their respective businesses for a number of years. Both parties had the full opportunity to review and make changes to the Lease. In Klingman's view, the Lease was prepared by "a combination between FMS and us." Moreover, prior to executing the Lease, Ranch House's shareholders reviewed and approved the Lease and knew of its proposed terms.

Despite the language in the Lease, there was never a sketch attached to or an intent by either party to include a sketch as part of the Lease. Thus, in determining what the parties' agreement was with respect to the parking, the Lease must be interpreted "in the light of the surrounding circumstances." *S.S. Jacobs Co.,* 164 So.2d at 249.

The only clear guidance of the exact leasehold is with respect to the building structure, which has the number 1915 as the street address of the restaurant just as the number 1911 is the street address of the motel. However, as reflected in the boundary survey prepared in 1996, the land owned by Rodriguez upon which are located the motel, restaurant, and miniature golf course is one parcel. Other than the outlines of the motel and restaurant building structures, there are no separate survey lines outlining what portions of the parking lot are associated with the motel, restaurant, or miniature golf course. Consistent with this, the Polk County Tax Collector treats the motel, restaurant, and miniature golf course as one parcel occupied by one building that includes both the motel and restaurant. According to the Polk County Tax Collector's records, this one parcel has the physical address of 1911 (not 1915) Cypress Gardens Boulevard.

Moreover, as depicted by the boundary survey, all of the property is one large parcel with a legal description, "Lots 79 through 82, inclusive, and Lots 85 through 91, inclusive" of a recorded plat. A view of the survey reflects that the restaurant physically occupies parts of lots 88 and 89, while the motel and miniature golf course wrap around the sides and rear of the restaurant and overlap on the rear portions of lots 88 and 89. Even though the boundary survey reflects that the restaurant and the motel are separate buildings, photographs of the property as well as a personal view of the premises taken by the Court during trial at the request of one of the parties,[1] indicates that the restaurant and motel share the same roof and therefore are physically connected. All areas within the parcel boundary not occupied by physical building structures or the minia-

---

1. Motion to View Premises (Doc. No. 82); Post–Trial Scheduling Order (Doc. No. 98).

ture golf course are designated, "Asphalt Parking Lot." There is no physical barrier separating the parking lot for the motel or restaurant guests—just one continuous asphalt lot.

Further, as Geri Irons, an employee of Polk County familiar with commercial project permitting and zoning testified, from the County's perspective the lots are not treated independently—rather the lots are combined to constitute one "project" or "parcel." Specifically, Ms. Irons testified that when one party owns all of the individual lots upon the same premises, the lots do not have any significance as to parking requirements and are not treated separately by Polk County. Thus, the restaurant structure is not a separate "parcel" unto itself.

Most important among these circumstances, even before the time of the Lease and before the IHOP restaurant opened, the restaurant's seating capacity was always between 104 and 106. The motel was built in 1971 or sometime prior to that year. It appears that the restaurant was "grandfathered" with respect to Polk County parking requirements. As a result, the restaurant was not subject to the zoning law requirements in effect in 1995 when the restaurant was remodeled following the execution of the Lease. If it had not been grandfathered, the parking requirements would have been 58 for the motel and 55 or 56 for the restaurant for a total of 113 or 114 spaces. The entire parcel upon which are located the motel, restaurant and miniature golf course [2] only contains 72 parking spots. While in their answer Ranch House Int'l and Rodriguez deny that the leased premises "encompass anything other than the restaurant building," at trial Rodriguez testified that the

premises also included the 19 spaces that are immediately in front of and to the west side of the building.

It is clear that 19 spaces are woefully short of the amount reasonably essential to use the property as a restaurant with 104 seats. In fact, in their post-trial brief, the defendants acknowledge that, "[t]he restaurant guests run out of parking spaces when 17 out of 62 tables in the restaurant are occupied." [3] It is also without dispute that FMS and Ranch House specifically discussed parking issues prior to executing the Lease. While the parties urge different interpretations of Klingman's testimony in this regard, from a review of all of the testimony, including viewing Klingman's videotaped deposition, the Court finds that sufficient parking was a necessary component of the agreed upon Lease terms.

While the Lease refers to parking without defining the extent or physical location of the parking, it is clear from the discussions between Klingman and Leonard that the parking lot would be shared in its entirety so that guests of either would be permitted to use the parking spaces located adjacent to the other building structure so long as it did not interfere with the operations of the other. This understanding was reciprocal—that is, if the motel was full and needed additional spaces, the motel's customers could park in the parking spaces adjacent to the restaurant and vice versa.

As stated by Klingman, "[i]f we were not full and there was not a car assigned to every room, and they had an overflow, we had an understanding that there would not be any problem with them using some of the rooms unoccupied parking area."

---

2. Sometime after this case was filed the miniature golf course was removed leaving that portion of the parcel vacant.

3. Defs.' Post–Trial Br. 17.

There were no spaces that were forbidden to the restaurant customers so long as it did not interfere with a guest at the motel. Not surprisingly, Ranch House had this same agreement with previous tenants of the restaurant.

After executing the Lease, FMS renovated the property into an IHOP restaurant. Since the time it opened, the restaurant's customers have used parking spaces abutting both the restaurant and the motel, and Ranch House's guests used those spaces designated for the rooms, as well as those spaces abutting the restaurant. Neither FMS nor Ranch House ever had problems with this arrangement while Klingman managed the motel through the end of 1997.

At the time that the Lease was executed, the dumpster was located in the same spot that it is located today, and it was the only dumpster on the premises at that time. Ranch House determined the location of the dumpster. FMS and Ranch House agreed that they would share the dumpster, and FMS agreed that it would pay for an extra pickup. FMS built a fence around the dumpster at its expense after executing the Lease.

Rodriguez and Gundolph Loew ("Loew") formed the corporation, Ranch House Int'l, as part of their acquisition of the entire property on November 19, 1996, which included an assignment to them personally of the Lease. At the time that they purchased the property, and at the time that Rodriguez first viewed the property, the IHOP restaurant was open for business. Loew conducted the negotiations on behalf of himself and Rodriguez.

Loew had assumed in his projections of income from the property for loan application purposes a rental income of $4,100 to $4,200 per month. However, prior to the closing of the sale, Loew and Rodriguez received a copy of the Lease. Rodriguez was aware of the fact that the Lease payments were only $600 per month prior to the closing. However, it appears he did not read the Lease or have anyone read it for him and explain its terms as he understood incorrectly that the Lease was only for a term of five years. It was not until 1999, when the first of five options was exercised, that he became aware of the additional option terms under the Lease.

From the time that Rodriguez and Loew first purchased the property, Rodriguez worked at the motel. Klingman continued to serve in her capacity as manager of the motel until around December 1997. Prior to purchasing the property and during the time that Klingman worked at the motel thereafter, Rodriguez never discussed with Klingman where IHOP customers were supposed to park, nor did Klingman ever tell him that the parking for IHOP guests was limited in any way.

On January 6, 1999, FMS exercised its option to renew the lease for an additional five-year term. Rodriguez acknowledged and agreed to the extension of the lease, and he continued to accept payments from FMS.

Shortly thereafter, in July 1999, Rodriguez and his counsel began contacting FMS regarding parking issues on the property, at which time Rodriguez threatened to tow IHOP customers' cars. Additionally, Rodriguez notified the restaurant suppliers that they could not use the motel's property to park delivery trucks, and he threatened formal actions against the suppliers if the drivers continued to make truck deliveries to IHOP using the motel's property. Further, in July of 2000, Rodriguez demanded that the restaurant employees stop using the dumpster and that FMS move the grease container that is located in the dumpster area.

On September 21, 2000, FMS commenced this action by filing a complaint in the Tenth Judicial Circuit in and for Polk County, Florida. FMS sought and obtained a temporary injunction on January 29, 2001, ordering the parties to cooperate regarding the parking and dumpster issues and refrain from harassing, confronting, or annoying the patrons of the other party or attempting to preclude any patron from parking in any area where a patron of either business could properly park.

On February 5, 2004, the defendants removed this action to this court pursuant to 28 U.S.C. section 1452(a).

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1334(b) and 157(a).

A. The Lease is Ambiguous as to the Extent of Parking and the Court must Resort to Extrinsic Evidence to Determine the Intent of the Parties.

■ The Lease provides that the premises that are subject to the Lease are the "restaurant facility and parking located at 1915 Cypress Gardens Boulevard, Winter Haven, Florida, and as more particularly depicted on the attached sketch." There is no dispute among the parties that such a sketch never existed.

The parties have offered conflicting positions as to what spaces FMS is entitled to under the Lease and what spaces presumably would have been depicted if a sketch had been prepared. In the first instance, in their answer, "[t]he Defendants deny that the property at 1915 Cypress Gardens Boulevard, encompass anything other than the restaurant building."[4] Later in the

case and at trial, they take the position that there are 19 parking spaces to which FMS is entitled to under the Lease, which Rodriguez concedes is not enough for a restaurant with 104 seats. Alternatively, Defendants argue that at most, FMS had a "terminable, oral overflow parking license"[5] under which restaurant guests "would only be allowed in specified overflow parking areas. . . ."[6]

FMS argues that the testimony of Leonard and Klingman support the position that "the parties' intent was to share parking and that parking was a specific issue that they discussed in negotiating the Lease."[7]

■ A word or phrase in a contract is ambiguous when it is of uncertain meaning and may be fairly understood in more than one way. *King v. Bray*, 867 So.2d 1224, 1229 (Fla. 5th DCA 2004); *see also Friedman v. Virginia Metal Products Corp.*, 56 So.2d 515, 517 (Fla.1952) ("The term ambiguous means susceptible of more than one meaning."); *Amer. Quick Sign, Inc. v. Reinhardt*, 899 So.2d 461, 465 (Fla. 5th DCA 2005) ("Ambiguity may be found when the provisions in the document admit to more than one interpretation.").

Indeed, an ambiguity exists here. The phrase "the restaurant facility and parking located at 1915 Cypress Gardens Boulevard and as more particularly described in the attached sketch" is ambiguous as to whether the parking is limited to the parking spaces abutting the restaurant front and side or whether the restaurant customers are allowed to park on the entire premises. *See AT & T Wireless Services of Fla., Inc.,* —— So.2d, at —— ("When a contract is ambiguous and the parties sug-

---

4. Amend. Ans. to Compl., at 4, ¶ 10.

5. Defs.' Post–Trial Br. 11.

6. Defs.' Post–Trial Br. 13.

7. Pl. Resp. in Opp'n 6–7.

gest different interpretations, the issue of the proper intention is an issue of fact requiring the admission of evidence extrinsic to the contract bearing upon the intent of the parties."); *see also South Parkway Building Corp. v. South Center Dept. Store, Inc.,* 19 Ill.App.2d 14, 19, 153 N.E.2d 291, 293 (1958)(despite street address description ambiguity existed based on actual use as well as different interpretations of what the address actually meant). There was never a sketch attached to the Lease, nor was FMS or Leonard ever given any plat or sketch showing what 1915 Cypress Gardens Boulevard encompassed. Leonard's belief was that the restaurant, motel, and miniature golf course were the same parcel. In fact, as discussed in the findings of fact, his understanding was consistent with the boundary survey and the records maintained by Polk County.

■ Because of the existing ambiguity in the description of the parking area, the Court must also consider any course of dealings between the parties in construing its terms. *Tampa Fed. Sav. & Loan Assn. v. Aeon, Inc.,* 403 So.2d 1002, 1004 (Fla. 2d DCA 1981). The law is well settled that past conduct by parties to a contract will serve to place a reasonable construction on an agreement that fails to define the parties' rights with certainty. *Bay Mgmt., Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 793 (Fla. 2d DCA 1978); *South Parkway Building Corp. v. South Center Dept. Store, Inc.,* 19 Ill.App.2d at 20–21, 153 N.E.2d at 294 (Evidence may be introduced "showing the situation of the parties at the time the lease was executed, the use of the disputed storerooms before the execution of the lease and thereafter, or any other collateral matter which shed light upon the intention of the parties at the time the lease was executed."); *see also Blackhawk Heating & Plumbing Co. v.*

*Data Lease Fin. Corp.,* 302 So.2d 404, 408 (Fla.1974) ("Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them.").

■ Where a lease and option to purchase agreement identifies a parcel of land by a street address and names the city and state in which it is located, then the court should properly receive parol evidence to determine the intent of the parties in light of surrounding circumstances so as to overcome any ambiguity regarding the extent of the parcel intended to be conveyed. *W. World, Inc. v. Dansby,* 566 So.2d 866, 868, (Fla. 1st DCA 1990)(citing *Lente v. Clarke,* 22 Fla. 515, 1 So. 149 (1886); *S.S. Jacobs Co.,* 164 So.2d at 249; *Paterson v. Brafman,* 530 So.2d 499 (Fla. 3d DCA 1988); *Westinghouse Credit Corp. v. Grandoff Investments, Inc.,* 297 So.2d 104 (Fla. 2d DCA 1974)).

■ Although no sketch was ever attached to the Lease, as the Lease suggests, there was a description and address of the premises contained in the Lease. At the most, this means that the contract contains an ambiguity as to the terms of the parking. If a contract fails to specify the rights of the party, the function of this Court is to ascertain the intent of the parties. *Hunt v. First Nat'l Bank of Tampa,* 381 So.2d 1194, 1197 (Fla. 2d DCA 1980).

■ As set forth in detail above, FMS and the motel shared the parking lot and the dumpster, without incident, for over four years before Rodriguez raised any issues about the parking situation or the dumpster. Clearly, this past and consistent conduct established and evidenced the parties' agreement to share the parking lot and the dumpster. Thus, this Court finds

that the parties' explicit discussions concerning parking at the time the Lease was executed, together with the subsequent course of conduct of the parties in sharing the parking lot and the dumpster, establish that it was the intent of the parties that the restaurant customers have full access to both areas.

B. The Law Requires that the Lease of a Specific Address Includes as much of the Premises as is Reasonably Necessary to Conduct its Business.

 Under Florida law, the general rule is that a description of the leased premises by a street number includes as much of the lot upon which the building is situated as is necessary for the purpose for which it was leased. *S.S. Jacobs Co.*, 164 So.2d at 249. In this case, the premises were leased for use as a restaurant. The restaurant necessarily needed sufficient parking to service its 104 seats.

While the lease of a particular part of a building ordinarily gives the lessee no rights outside the described lease premises, in addition, "[e]verything which belongs to, or is used with, and appurtenant to, the demised premises and which is reasonably essential to the enjoyment of the leased premises passes as an incident thereto, unless specially reserved." *Id.* The ultimate question depends upon the intent of the parties as interpreted in the light of surrounding circumstances. *Id.*

Here, without sufficient parking, customers could not reasonably be expected to patronize the restaurant. Practically speaking, if a customer does not have a space in which to park, the customer will go to another restaurant. This would significantly harm the restaurant's business.

The testimony presented to this Court established that the survival of the restaurant was important to both Ranch House

and FMS. Klingman testified that because the motel clientele were mostly long term or groups, it was particularly important that an operating restaurant be located on the property. "[I]t's a real asset to a hotel or motel to have a restaurant available for their clientele, that's the main reason most hotels and motels have them, to have the availability there for their customers and to be able to market it as so."

It was evident that Klingman, an experienced motel operator and businesswoman, was aware of the fact that in order for the restaurant to operate successfully, it had to have sufficient parking. This can be easily inferred from the various discussions between Klingman and Leonard concerning how parking would be dealt with under the Lease. Their understanding was that the parking lot would be shared in its entirety so that guests of either would be permitted to use the parking spaces located adjacent to the other building structure so long as it did not interfere with the operations of the other.

Without question, the parking that was included in the leasehold by Klingman was "reasonably essential to the enjoyment of the leased premises." *S.S. Jacobs Co.*, 164 So.2d at 249. Anything less, particularly the 19 spaces conceded by Rodriguez as being included in the Lease, would deprive FMS of its right to quiet enjoyment of the premises.

C. The Parol Evidence Rule, Doctrine of Merger, and Statute of Frauds Defenses are Unavailing.

Defendants set forth a section in their Post–Trial Brief entitled, "The Hornbook Trilogy," in which they assert a variety of defenses, arguing that based on these defenses, FMS is not entitled to judgment in

its favor.[8] However, none of the defenses that Defendants have presented are available under the circumstances of this case.

### 1. FMS is not Barred by the Parol Evidence Rule from Introducing Testimony Regarding Contract Negotiations Between FMS and Ranch House.

■ Defendants assert that the parol evidence rule precludes FMS from introducing any prior or contemporaneous oral testimony regarding negotiations of a contract if that testimony is being offered for the purpose of contradicting the express terms of the contract.[9] Specifically, Defendants assert that FMS's "only purpose for attempting to offer Leonard's equivocal testimony about shared parking [was] to attempt to modify or alter an otherwise clear description of the leased premises as 1915 Cypress Gardens Boulevard, the Restaurant Out–Lot Parcel." [10]

■ Parol evidence is admissible to determine the description of a piece of property "so long as the instrument itself shows that the parties were contemplating a particular piece of property—rather than an unspecified piece of property or alternative descriptions or property to be obtained later." *Bajrangi v. Magnethel Enterprises, Inc.*, 589 So.2d 416, 419 (Fla. 5th DCA 1991) (citing *Edmun Realty Corp. v. Kearns*, 158 Fla. 558, 28 So.2d 834 (1947)) (internal citations omitted) (emphasis omitted). Further, parol evidence is admissible to establish a contemporaneous oral

agreement that induced the execution of a written contract, even though that evidence may vary, reform or change the instrument. *Wise v. Quina*, 174 So.2d 590, 596 (Fla. 1st DCA 1965).

The Court will allow parol evidence to determine the intent of the parties to the Lease because, as described above, the Lease is ambiguous. The Lease shows that the parties were contemplating a particular piece of property—the restaurant attached to the motel and the entire parking area. *Bajrangi*, 589 So.2d at 419.

In *Bajrangi*, the Fifth District Court of Appeal looked at whether parol evidence or extrinsic evidence was admissible to explain the parties' intent when a legal description contained an ambiguity. *Id.* "The liberal rule of construction as it relates to descriptions, as announced by the various Florida Supreme Court decisions is that parol evidence is admissible to determine the description, so long as the instrument shows that the parties were contemplating a particular piece of property...." *Id.* at 418 (emphasis added). The court found that the parties to the agreement had intended a specific piece of property and it reversed and remanded the case back to the trial court to determine what extent of the property was encompassed by the description "1101–1/2 East Plant Street ... and the surrounding real estate." *Id.* at 419.

Here, like the agreement in *Bajrangi*, the description of the leasehold in the

8. Defs.' Post–Trial Br. 17.

9. At trial, Defendants' counsel raised the issue of the parol evidence rule during the testimony of Leonard, but the Court allowed testimony as to his discussions with Klingman prior to the execution of the Lease. The Court instructed Defendants' counsel that, "[a]t the end of the testimony, if you want to renew your motion by way of a motion to strike the testimony based on the parol evidence rule,

which is the basis for your objection, I'll entertain it at that time." (Trial Tr. vol. I, 25:7–27:19). Defendants' counsel never renewed her motion at the end of the testimony. Even if the motion had been renewed, it would have been denied for the reasons stated herein.

10. Defs.' Post–Trial Br. 18.

Lease is ambiguous as to the extent of the property encompassed by the description "restaurant and parking located at 1915 Cypress Gardens Boulevard and as more particularly depicted...." Obviously, FMS and Ranch House intended a specific portion of property, and this Court need only determine what parking is included in the description. Because of this ambiguity, this Court will allow parol evidence to determine the parties' intent.

2. The Doctrine of Merger is not Applicable to this Case.

 Defendants argue that the doctrine of merger extinguished all prior agreements and understandings concerning parking and that the parties' final lease contained their only agreement regarding parking: specifically, the restaurant customers could park only in those spaces abutting the restaurant.[11] As Defendants point out, the doctrine of merger is applicable to real estate transactions, and is discussed most frequently in the context of deeds. *See, e.g., Southpointe Dev., Inc. v. Cruikshank,* 484 So.2d 1361, 1362 (Fla. 2d DCA 1986); *Kidd v. Fowler,* 498 So.2d 969, 970 (Fla. 4th DCA 1986); *Fraser v. Schoenfeld,* 364 So.2d 533, 534 (Fla. 3d DCA 1978). As applied in that context, "preliminary agreements and understandings relative to the sale of property usually merge in the deed executed pursuant thereto." *Milu, Inc. v. Duke,* 204 So.2d 31, 33 (Fla. 3rd DCA 1967). However, as noted in *Milu,* there are exceptions to the merger rule. *Id.* For example, a conveyance not accepted as covering the entire subject matter contracted for does not operate as a merger of a prior contract. *Gabel v. Simmons,* 100 Fla. 526, 129 So. 777, 778 (1930). In this case, the Lease did not cover the extent of parking by its failure to

adequately describe the parking areas in the Lease or by a sketch attached to the Lease. If, on the other hand, the Lease was not ambiguous as to what parking was provided in connection with operation of the restaurant, then any prior discussions would be merged into the written Lease. However, in this case there is no later agreement which could operate to supersede any prior oral discussions because the parties failed to provide the referenced sketch or otherwise describe the parking.

 Further, Defendants did not raise the doctrine of merger as a defense or affirmative defense, nor did they present this defense at trial. Because Defendants did not raise this defense, they have waived it.

3. The Statute of Frauds does not Apply in this case.

 Despite Defendants' arguments to the contrary, there is not a statute of frauds issue in this case. Rather, the issue in this case is whether the parties to the Lease intended to share the entirety of the parking area when they executed the Lease. Defendants argue that FMS's claim of parking is barred by the statute of frauds as contained in sections 725.01 and 689.01, Florida Statutes, because FMS's claim for parking is for more than one year, but is found nowhere in any written instrument.[12] To the contrary, here there is a written agreement—the Lease.

 To satisfy the statute of frauds, the written memorandum must disclose all the terms of the contract and cannot rest partly in writing and partly in parol. *Rhode v. Gallat,* 70 Fla. 536, 70 So. 471 (1915). In fact, in this case, the Lease does set forth the terms, the parties, and all other requirements necessary to satisfy

---

**11.** Defs.' Post–Trial Br. 19–20.

**12.** Defs.' Post–Trial Br. 19–20.

the statute of frauds. *Minsky's Follies of Fla. v. Sennes,* 206 F.2d 1, 3–4 (5th Cir. 1953).

■ Further, "proving the actual description of a parcel which the instrument shows was intended by the parties to be conveyed does not 'add anything to the terms of the agreement' and, thus, [does] not violate the statute of frauds." *Bajrangi,* 589 So.2d at 419 (quoting *Lente v. Clarke,* 22 Fla. 515, 1 So. 149 (1886); and *Simons v. Tobin,* 89 Fla. 321, 104 So. 583 (1925)). As established in detail above, the parties intended that the use of parking on the entire lot be included in the description of the premises, which is clear from the Lease, and, therefore, the Lease does not violate the statute of frauds.

■ Moreover, even if the statute of frauds were otherwise applicable, FMS's use of the entire lot for its guests after the Lease was executed takes this agreement outside of the statute of frauds. "To take the transaction out of the statute [of frauds], possession must have been under and in pursuance of the Lease." *Sennes,* 206 F.2d at 4 (citing *Williams v. Bailey,* 69 Fla. 225, 67 So. 877(1915)). Here, FMS took possession of the entire parcel for parking, to which neither Ranch House nor Defendants objected, and that possession was taken pursuant to the Lease. As such, the parking agreement is not barred by the statute of frauds.

■ Finally, the defense of the statute of frauds must be affirmatively pled. Fed. R. Bankr.P. 7008 (incorporating Fed. R.Civ.P. 8(c)); *Oxford Furniture Companies, Inc. v. Drexel Heritage,* 984 F.2d 1118, 1124 (11th Cir.1993). Defendants have never raised the statute of frauds as an affirmative defense in either their pleadings or at trial, and, thus, they have waived this defense.

D. **FMS is Entitled to use the Dumpster and Grease Barrel.**

■ This leaves for the Court's consideration the dumpster and grease barrel issues. The Defendants have offered to allow continued use of the dumpster area if FMS continues to pay one-half of the cost and acceptable rules for safety and cleanliness are developed. The Court will include in the final judgment an order directing the parties to draft agreed-upon rules within fifteen (15) days from the entry of the judgment. If the parties are unable to agree upon such rules, the Court will enter an appropriate order setting the rules for operating and maintaining the dumpster area.[13]

E. **Attorney's Fees.**

■ Paragraph 14 of the Lease provides that, "In the event litigation should arise hereunder due to an alleged breach of this Lease or to enforce this Lease, the prevailing party shall be entitled to all costs, including reasonable attorneys fees

---

**13.** In their argument as to FMS's use of the dumpster and the grease barrel, Defendants state that "the Court can also take judicial notice that the motel does not contribute noxious items to these facilities such as food products which decompose and can cause grease and odors unacceptable to hotel guests." Defs.' Post–Trial Br. 23. Under Federal Rules of Evidence, a judicially noticed fact must be one that is either generally known within the territorial jurisdiction of the trial court or a fact that is capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Fed. R. Ev. 201(b). Simply put, whether or not the motel contributes "noxious items" to the shared dumpster is not a fact concerning which any court could take judicial notice. It is clearly a type of fact that, if relevant, must be proven by admissible evidence such as a properly authenticated document or the testimony of a witness with knowledge. Fed.R.Evid. 602 and 901.

and court costs as assessed by the court." By its terms, this provision is meant to compensate the prevailing party in an action which has to be brought because of the other party's default.

However, there has been no finding by the Court that either party breached the Lease—only that there was an ambiguity in the Lease with each party urging a different interpretation. This required a declaration by the Court of the parties' respective rights under the Lease. Moreover, as discussed above, neither party ever had the intent to attach the sketch to the Lease. While FMS prepared the draft of the Lease that was used, attaching the sketch is something either party could have done. If a sketch had been attached depicting the parking to be provided under the Lease, this action would have been unnecessary. It is clear, therefore, that the parties to the Lease were equally at fault in the failure to attach a sketch outlining with particularly the extent of the parking to be provided and that this failure resulted in this action having been brought.

 The general rule in Florida is that where a contract provides for an award of prevailing party attorney's fees, as the Lease in this case provides, the trial court is without discretion and must enforce the provision for the benefit of the prevailing party. *Lasco Enter. v. Kohlbrand*, 819 So.2d 821, 826 (Fla. 5th DCA 2002). However, while a suit for declaratory judgment may result in an award of fees under a prevailing party provision, Florida law has been interpreted to apply exceptions in instances in which such fee awards are not appropriate. *See Cable Marine, Inc. v. M/V Trust Me II*, 632 F.2d 1344, 1345 (5th Cir.1980)[14] (finding that a court may decline to award attorney's fees

authorized by a contractual provision when award would be inequitable and unreasonable); *Careers USA, Inc. v. Sanctuary of Boca, Inc.*, 705 So.2d 1362, 1363 (Fla.1998)(citing *Chesterfield Co. v. Ritzenheim*, 350 So.2d 15 (Fla. 4th DCA 1977))(denying attorney's fees in declaratory judgment action where award provision was limited to fees incurred by reason of breach and no breach occurred).

It is the Court's judgment, therefore, that where an action on a contract is brought to resolve an ambiguity created by the failure of both parties to attach a sketch referenced in the contract, then neither party is the prevailing party entitled to an award of attorney's fees under a prevailing party provision.

F. Conclusion.

The Lease did not adequately describe the parking available to the tenant of the leasehold premises, the restaurant located on the motel property. Under Florida law, when a contract is ambiguous and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring a review of evidence extrinsic to the contract bearing upon the intent of the parties. Moreover, the general rule is that a description of the leased premises by a street number includes as much of the lot upon which the building is situated as is necessary for the purpose for which it was let. *S.S. Jacobs Co.*, 164 So.2d at 249.

While a lease of a particular part of a larger parcel "ordinarily gives the lessee no rights outside such part," it also gives the lessee such rights "as were intended to be included as appurtenant to the beneficial enjoyment thereof, or such as it was manifest had been designed and appropri-

---

**14.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent Fifth Circuit decisions rendered prior to October 1981.

ated for the benefit of the leased premises. Everything which belongs to, or is used with, and appurtenant to, the demised premises and which is reasonably essential to the enjoyment of the leased premises passes as an incident thereto, unless specially reserved." *Id.*

The Court concludes that the property rights under the Lease include shared use of the parking lot by both parties so long as the use does not interfere with the primary use by the other. By way of example, if the motel is less than completely full, then such additional parking spaces as are not needed for the motel guests will be available at any time for use by the restaurant guests.

In addition, the dumpster and grease container will continue to be available for use by either party. FMS's suppliers will have the right to access the restaurant to include temporarily parking on the shared parking areas while making deliveries.

A separate final judgment will be entered declaring:

(a) Either party will have the right to the use of the contiguous parking lot areas to the extent not occupied by guests of the other. The motel guests shall have first use of the spaces located outside their doorways. The restaurant guests shall have first use of the spaces located in front of and to the side of the restaurant.

(b) The rights to use the dumpster and grease trap at its present location will continue with the parties to continue their current cost-sharing arrangement. The parties are directed to draft and submit for the Court's approval, rules for operating the dumpster area within fifteen (15) days from the date of the final judgment.

(c) FMS will have the right of access for delivery trucks to the restaurant property.

(d) The parties shall enter into a Memorandum of Lease, which shall set forth the material terms of the Lease to include a legal description of the restaurant property and a reference to the Court's declaratory judgment entered in this adversary proceeding.

(e) Defendants shall be enjoined from interfering with the quiet enjoyment by FMS to the use of the restaurant consistent with the terms of these findings of fact and conclusions of law.

(f) Each side will bear their own costs and attorney's fees.